# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| DALE GOVRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 1418 ERW / DDN |
| | ) | |
| CAROLYN W. COLVIN | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Dale Govro for supplemental security income under Title XVI of Social Security Act, 42 U.S.C. § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be affirmed.

## I. BACKGROUND

Plaintiff Dale Wayne Govro, born January 31, 1960, applied for Title XVI benefits on January 5, 2009. (Tr. 165-67.) He alleged an onset date of disability of October 1, 2004, later amended to December 29, 2008, due to hearing voices, neck and throat problems, and a chest growth. (Tr. 176, 188.) Plaintiff's application for Title XVI benefits was denied initially on February 11, 2009 and he requested a hearing before an ALJ. (Tr. 87-94.) On December 22, 2009, following a hearing, the ALJ found plaintiff not disabled. (Tr. 72-79.)

On October 27, 2011, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. (Tr. 84-85.) On March 26, 2012, following a second hearing, an ALJ again found plaintiff not disabled. (Tr. 11-22.) On May 15, 2013, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the second decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On January 9, 2008, plaintiff visited with Roberta Stock, RN, CS, APMHCNS[1], for a mental examination and treatment plan. Stock noted that plaintiff's thoughts were very fragmented, and he continued to speak of hallucinations and hearing voices. She recommended that an alcohol and drug evaluation become a condition of his continued care at Comtrea. Stock suspected drug and alcohol use, namely methamphetamine, even though plaintiff denied it. Stock also ordered a cholesterol test with his local doctor. Plaintiff continued to be noncompliant with medications; he was on Seroquel as an antipsychotic and sleep aid but had not taken the prescribed dosage. He refused to switch to other antipsychotics, despite complaints that Seroquel caused drowsiness. Plaintiff previously tried Invega and Abilify and stopped use of both medications.[2] Stock described plaintiff as alert and oriented, neatly dressed, and talkative. Plaintiff denied increased depression, suicidal, or homicidal ideation. Stock diagnosed paranoid-type schizophrenia, polysubstance dependence in remission, and chronic back pain and assessed a GAF score of 45.[3] (Tr. 259-60.)

---

[1] APMHCNS is an acronym for Adult Psychiatric Mental Health Clinical Nurse Specialist. This certification covers ages 18 and above. The National Commission for Certifying Agencies and the Accreditation Board for Specialty Nursing Certification accredits this ANCC certification. Once applicants complete eligibility requirements to take the certification examination and successfully pass the exam, they are awarded the credential: Adult Psychiatric-Mental Health Clinical Nurse Specialist. Eligibility requirements to sit for the exam include: holding a current RN license, holding a master's, postgraduate, or doctoral degree from an accredited adult psychiatric–mental health clinical nurse specialist program, and a minimum 500 supervised hours in the adult psychiatric mental health clinical nurse specialist role. ANCC, http://www.nursecredentialing.org (last visited on July 23, 2014).

[2] Invega is a medication used to treat certain mental/mood disorders such as schizophrenia and schizoaffective disorder. WebMD, http://www.webmd.com/drugs (last visited on June 20, 2014). Abilify is a brand of aripiprazole used to treat certain mental/mood disorders such as bipolar disorder, schizophrenia, and irritability associated with autistic disorder. Id.

[3] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

A score from 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed. 2000) ("DSM").

On the same day, plaintiff was very upset with his case manager over his paperwork. Plaintiff accused the case manager of making false statements in his quarterly reports. He expressed serious concern about the meaning of the medical codes and statements regarding drug use in his chart due to his pending disability application. Plaintiff also reported that he had been hearing the voices since his youth and that drug use did not cause them. (Tr. 278.)

On January 14, 2008, plaintiff reported taking only half the prescribed dosage of Seroquel because the full dosage caused him to sleep for 10 to 16 hours. He stated that his condition had worsened since he began treatment at Comtrea but that he continued treatment because he heard voices and needed disability benefits. The case manager informed plaintiff that continued service would require an alcohol and drug evaluation, and he agreed to schedule one. (Tr. 277.)

On January 21, 2008, Comtrea assigned plaintiff a new case manager. (Tr. 276.)

On February 27, 2008, plaintiff visited his primary care physician, Philip Rowden, MD, at Desoto Family Practice for his cholesterol test results. Dr. Rowden prescribed a refill of Zocor to control plaintiff's high cholesterol. He noted a normal general appearance, and normal skin, heart and lung functions and assessed hyperlipidemia. (Tr. 304.)

On March 5, 2008, plaintiff again visited nurse Stock at Comtrea. He had not yet scheduled an alcohol and drug evaluation, and Stock told him he had one month to complete the evaluation. He stated that he had not used alcohol or methamphetamine in six months and that he had taken the prescribed dosage of Seroquel. Plaintiff continued to report voices telling him what to do, occasionally calling him stupid, and synchronizing their voices with the people around him. Plaintiff reported anxiousness around other people and suspected that people watched him. He continued to report that his prescribed dosage of Seroquel caused tiredness. Stock explained that a lesser dosage would likely increase the severity of symptoms. He continued to resist other antipsychotic medication. Stock described him as alert and oriented, neatly dressed, and talkative with a blunt affect and fragmented thoughts. She diagnosed paranoid type schizophrenia, polysubstance dependence allegedly in remission, chronic back pain, and high cholesterol and assessed a GAF of 40 to 45. (Tr. 257-58, 273.)

On March 13, 2008, plaintiff went to Dr. Rowden, complaining of a cough that began two weeks earlier and fever. Dr. Rowden assessed pneumonia, nicotine habit, and schizophrenia. He also prescribed Cipro and albuterol.[4] Chest X-rays revealed no abnormalities. (Tr. 303, 307.)

On April 2, 2008, plaintiff again met with Clinical Nurse Specialist Roberta Stock at Comtrea. Plaintiff indicated that he had been taking the full prescribed dosage of Seroquel. He seemed less anxious and fragmented with no depression or overt psychosis. He stated that he continued to hear voices. Plaintiff also reported periodic work mainly with drywall but no work that month. He stated that he could not perform jobs with many people around him. Stock diagnosed paranoid-type schizophrenia, polysubstance dependence with questionable use, chronic back pain, and high cholesterol and assessed a GAF of 45 to 50. (Tr. 255-56.)

On April 30, 2008, plaintiff reported that he had scheduled an alcohol and drug evaluation for the following day. He denied drug or alcohol use and reported taking full prescribed dosages of Seroquel. Stock observed that his thoughts seemed more fragmented than the previous visit. Stock diagnosed paranoid-type schizophrenia, polysubstance dependence allegedly in remission, chronic back pain, and high cholesterol and assessed a GAF of 40 to 45. (Tr. 253-54.)

On April 30, 2008, plaintiff informed his case manager that he had only been taking half the prescribed dosage of Seroquel because the full dosage caused drowsiness and the inability to start the following day. He also reported that he felt less depressed. (Tr. 269.)

On May 1, 2008, plaintiff met with Dale Denham, RSAP, of the Department of Mental Health. Denham found that plaintiff had a moderate problem with alcohol and that treatment was probably necessary. He also found a slight problem with drugs and that treatment was probably not necessary. He stated he had not used drugs or alcohol in the past thirty days but admitted using alcohol for twenty-five years and cannabis for ten years. The report did not mention use of amphetamines. Plaintiff reported ten drug charges and seven driving while intoxicated charges. Denham also indicated that plaintiff experienced serious depression, serious anxiety or tension, hallucination, and difficulty with violence control within the past thirty days

---

[4] Cipro is an antibiotic used to treat a variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited June 23, 2014). Albuterol is used to prevent and treat wheezing and shortness of breath cause by breathing problems. It works in the airways by opening breathing passages and relaxing muscles. Id.

and throughout plaintiff's lifetime. He rated plaintiff's psychological issues as extreme and found that treatment was necessary. (Tr. 286-92.)

Denham also noted that plaintiff responded to several questions by maintaining that his only problem was that voices controlled him. He described plaintiff as very vague when questioned about his use of mood altering chemicals. Plaintiff stated that past reports of heavy alcohol and methamphetamine use reflected use that occurred years ago. He stated he stopped using methamphetamine over two years earlier. He admitted a history of homicidal thoughts, especially toward his ex-girlfriend, but denied any present thoughts of homicide or suicide. Plaintiff stated that he did not want nor need treatment but only needed proper medication. Denham recommended that he continue to see his case manager and his psychiatrist and to take his medication. (Tr. 270.)

On June 11, 2008, plaintiff met with Ronald L. Beach, M.D., at Comtrea. He stated that he had heard voices for so long that he could often ignore them. He reported taking the full prescribed dosage of Seroquel and denied major side effects. Dr. Beach diagnosed psychotic disorder, history of polysubstance dependence, and chronic back pain and assessed a GAF of 45. (Tr. 252.)

On August 6, 2008, plaintiff reported hearing voices throughout the day. Clinical Nurse Specialist Stock described plaintiff's complaints as dramatic and histrionic. He requested a note stating that he cannot work in order to avoid paying child support. He continued to dwell on the denial of his application for disability benefits. He also reported that he had taken no medication and had not sought further treatment to control lipid levels. Stock diagnosed paranoid-type schizophrenia, polysubstance abuse in remission, personality disorder, chronic back pain, and high cholesterol and assessed a GAF of 45. She further recommended that he seek treatment to control his cholesterol. (Tr. 250-51.)

On September 17, 2008, plaintiff stated that he had two to three beers occasionally but denied drug use. He stated that he performed yard work, including cutting the grass. He again complained of hearing voices throughout the day and stated that he tended to avoid others. He also requested a note stating that he cannot work. Stock increased plaintiff's dosage of Seroquel, and he agreed to take the increased dosage. She diagnosed paranoid-type schizophrenia, polysubstance dependence with recent use of alcohol, personality disorder, chronic back pain, and high cholesterol and assessed a GAF of 50. (Tr. 248-49.)

On September 24, 2008, plaintiff reported that he continued to hear voices. Dr. Rowden ordered a comprehensive metabolic panel and assessed hyperlipidemia, schizophrenia, and tobacco habit. (Tr. 301.)

On October 5, 2008, plaintiff complained of high cholesterol and high blood pressure. Dr. Rowden assessed hyperlipidemia and schizophrenia and prescribed Zocor. (Tr. 300.)

On November 12, 2008, plaintiff reported that the increased dosage of Seroquel improved his sleep but denied that it caused other changes. He also reported still hearing voices. Dr. Beach continued plaintiff on the increased dosage of Seroquel. Additionally, plaintiff complained that the inability to obtain disability benefits caused depression. Dr. Beach diagnosed psychotic disorder, paranoid-type schizophrenia, history of polysubstance dependence, and chronic back pain and assessed a GAF of 45. (Tr. 247.)

On January 6, 2009, plaintiff arrived at the emergency room, complaining of pain from a large abscess on his chest. Plaintiff indicated that he had had the steadily growing abscess for ten years. Debra K Gremminger, FNP, drained the abscess, and prescribed antibiotics. (Tr. 348-69.)

Also on January 6, 2009, plaintiff visited with Nurse Stock. He indicated that Dr. Rowden placed him on medications for his cholesterol. Plaintiff reported taking his full prescription of Seroquel but resisted trial of any other antipsychotics. He resisted the vocational rehab encouraged by Stock due to hearing voices. He denied any recent drug or alcohol use. Stock noted that he continued to be dramatic and seemed somewhat manipulative but that his thoughts were not fragmented and were within normal limits. Plaintiff again asked for a note related to being unable to pay child support and unable to work. Stock diagnosed paranoid-type schizophrenia, polysubstance abuse and dependence in early remission, chronic back pain, high cholesterol, and a GAF score of 50. (Tr. 399-400.)

On February 11, 2009, plaintiff had a mental examination performed by James Spence, Ph.D. Dr. Spence found that plaintiff suffered psychotic disorder and polysubstance abuse. Related to substance abuse, Spence noted that after one previous treatment session which saw the abstinence of drugs, plaintiff was discharged with a GAF score of 75[5] assigned. He further

_____

[5] On the GAF scale, a score from 71–80 indicates that symptoms, if any, are transient and expectable reactions to psycho-social stressors (such as difficulty concentrating after a family

found moderate restriction with daily living activities, marked difficulties with social functioning, marked difficulties with concentration, persistence or pace, and one or two episodes of decompensation. Additionally, he found that plaintiff satisfied Listing 12.03. However, he recommended a denial of benefits, reasoning that drug abuse, drug dependency and noncompliance with his prescribed medications caused plaintiff's mental condition. (Tr. 308-20.)

On March 11, 2009, plaintiff complained of hearing voices throughout the day and that people did not believe him about the voices. He reported that his supply of Seroquel lasted until the day of this appointment. However, Stock questioned his medication compliance, noting that he should have exhausted his supply of Seroquel fourteen days earlier. He also continued to complain about the denial of his disability benefits application. Stock diagnosed paranoid-type schizophrenia, polysubstance dependence in remission, chronic back pain, and high cholesterol and assessed a GAF score of 50. (Tr. 397-98.)

On May 6, 2009, plaintiff reported continuing to hear voices, but was vague and nonspecific in describing them. He was alert and oriented, and continued to be dramatic and manipulative. Plaintiff refused any changes in medication, and Stock again questioned his compliance. Stock diagnosed paranoid-type schizophrenia, substance abuse and dependence in remission, chronic back pain, high cholesterol, and a GAF score of 50. (Tr. 395-96.)

On May 24, 2009, plaintiff entered the emergency room, complaining of itchiness and small, white insects on his skin. Milton Sallis, M.D., found no insects or insect bites on his skin, and diagnosed dry skin. (Tr. 330-46.)

On July 1, 2009, plaintiff complained of severe back and neck pain. X-rays of his lumbar spine showed minimal alterations, normal curvatures, and no other abnormality. X-rays of his thoracic spine showed altered curvatures and mild degenerative changes at T5-6 and T6-7.[6] X-

---

argument) and no more than a slight impairment in social, occupational, or school functioning (such as temporarily falling behind in schoolwork). DSM at 32-34.

[6] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1–C7), twelve thoracic vertebrae (denoted T1–T12), five lumbar vertebrae (denoted L1–L5), five sacral vertebrae (denoted S1–S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary at 226, 831, 1376, 1549, 1710 (28th ed., Lippincot Williams & Wilkins 2006).

rays of his neck showed degenerative changes of the middle and upper cervical spine with foraminal impingement at C4-5 and C5-6. (Tr. 327-29, 381.)

On July 20, 2009, Dr. Rowden noted that plaintiff had stopped taking medication for high cholesterol. He explained to plaintiff the importance of the medication. (Tr. 378.)

On July 20, 2009, Nurse Stock conducted a mental evaluation with plaintiff. Stock noted marked limitations with the ability to cope with normal work stress, function independently, behave in an emotionally stable manner, interact with the general public, accept instructions and respond to criticism, maintain attention to work tasks for up to two hours, perform at a consistent pace, sustain an ordinary routine without special supervision, respond to changes in work setting, and work in coordination with others. She further found moderate limitations with the ability to relate in social situations, maintain socially acceptable behavior, understand and remember simple instructions, and make simple work-related situations. Stock stated that the medically determinable impairments would cause unpredictable interruptions during a normal work day or work week, noting that there would likely be more than three or four interruptions a month, each potentially lasting several days. She also found that plaintiff's impairments would cause him to be absent and late to work more than three or four times per month. Stock's diagnoses included schizophrenia, substance abuse in remission, chronic back pain, and high lipids, and she assessed a GAF of 50. (Tr. 323-25.)

On July 22, 2009, plaintiff met with Dr. Gautam Rohatgi, D.O., at Comtrea to develop a treatment plan with the primary goals of obtaining Seroquel and not hearing voices. He reported being proficient with guitar playing and construction and that he could fix cars. (Tr. 410-11.)

On July 27, 2009, plaintiff visited with Dr. Rohatgi at Comtrea. He reported hearing voices that issued him commands but that he did not follow them. He further described the voices as aggravating and negative and reported that they caused him discomfort around groups of people. Plaintiff felt as though he was being watched. He also reported smoking one pack of cigarettes per day and that he drank three or four beers one or two times per month, but denied methamphetamine use. He reported that he owed about $16,000 in child support. Plaintiff said that he performed chores around the house. Dr. Rohatgi observed good mood but poor insight and fair to poor judgment. He continued his dosage of Seroquel, diagnosed plaintiff with paranoid-type schizophrenia, methamphetamine dependence in sustained full remission, history

of alcohol abuse, chronic back pain, hyperlipidemia, and arthritis, and assessed a GAF score of 43. (Tr. 392-94.)

On September 14, 2009, plaintiff stated to Dr. Rowden that his Seroquel dosage was too high and that Comtrea continued to increase it. Dr. Rowden noted that he smoked more than a pack of cigarettes a day. He diagnosed high cholesterol and paranoid-type schizophrenia. (Tr. 376.)

On September 28, 2009, plaintiff reported hearing voices throughout the day and a feeling of being watched. He described the voices as frustrating, negative, and guilt-inducing. He reported that he did not take the full prescribed dosage of Seroquel because it caused excessive sedation and tiredness but requested the full dosage to maintain the appearance of medication compliance. Dr. Rohatgi observed good mood, poor insight, and fair to poor judgment. He lowered the dosage of Seroquel and also prescribed Haldol.[7] He diagnosed paranoid-type schizophrenia, methamphetamine dependence in full remission, history of alcohol abuse, arthritis, hyperlipidemia, and chronic back pain and assessed a GAF score of 43. (Tr. 390-91.)

On October 12, 2009, Dr. Rohatgi completed a mental medical source statement for plaintiff. Dr. Rohatgi noted marked limitations with plaintiff's ability to cope with normal work stress and accept instructions and respond to criticism. He also noted moderate restrictions with the ability to function independently, behave in an emotionally stable manner, relate in social situations, interact with general public, maintain socially acceptable behavior, maintain attention to work tasks for up to two hours, perform at a consistent pace, sustain an ordinary routine without special supervision, respond to changes in a work setting, and work in coordination with others. He could not assess plaintiff's ability to understand and remember simple instructions or make simple work-related decisions. Dr. Rohatgi stated plaintiff's medically determinable impairment would cause unpredictable interruptions during a normal work day or work week but could not state how often. His diagnoses included paranoid-type schizophrenia, methamphetamine dependence in full, sustained remission, and he assessed a GAF of 43. (Tr. 415-18.)

---

[7] Haldol is used to treat certain mental/mood disorders like schizophrenia. WebMD, http://www.webmd.com/drugs (last visited June 23, 2014).

On October 19, 2009, plaintiff complained of auditory hallucinations and feeling as though he was being watched. He reported tiredness throughout the day but that the symptom predated the Haldol prescription. Dr. Rohatgi assessed paranoid-type schizophrenia, methamphetamine dependence in full-sustained remission, hyperlipidemia, arthritis, and chronic back pain. He doubled plaintiff's daily dosage of Haldol, and continued Seroquel at the lowered daily dosage. (Tr. 513-14.)

On November 17, 2009, plaintiff met with Jhansi Vasireddy, M.D., at Comtrea. He reported hearing voices that instructed him to hurt himself, but that he did not follow the instructions. He further reported that he lived with his parents and often helped them with household chores. He complained of chronic back pain. Dr. Vasireddy diagnosed chronic paranoid schizophrenia, methamphetamine dependence in sustained full remission, history of alcohol abuse, hyperlipidemia, arthritis, and chronic back pain. He assessed a GAF score of 50 to 55,[8] and prescribed Cogentin.[9] (Tr. 511-12.)

On December 14, 2009, plaintiff reported improved condition following the adjustments to his medication and that he heard voices only occasionally. He also reported less anxiety. Dr. Vasireddy decreased the Haldol dosage, diagnosed chronic paranoid schizophrenia, methamphetamine dependence in sustained full remission, history of alcohol abuse, arthritis, chronic back pain, and hyperlipidemia; and assessed a GAF score of 55 to 60. (Tr. 509-10.)

Also on December 14, 2009, plaintiff visited Steven Crawford, D.O., to check his cholesterol. Dr. Crawford noted schizophrenia and high cholesterol, and prescribed medication for his cholesterol. (Tr. 481.)

On January 19, 2010, plaintiff reported not taking Haldol, and Dr. Vasireddy discontinued Haldol and Cogentin but increased the dosage of Seroquel. Dr. Vasireddy also noted that plaintiff was alert and oriented, had good eye contact, no suicidal or homicidal ideations, and fair insight and judgment. Plaintiff also reported hearing the voices throughout the day that instructed him to commit suicide but that he slept well. Dr. Vasireddy explained that

---

[8] On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). DSM at 32-24.

[9] Cogentin is a type of benztropine used to treat symptoms of Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs like Haldol. WebMD, http://www.webmd.com/drugs (last visited July 30, 2014).

medication would decrease the intensity of the voices but would not eliminate them. He diagnosed chronic paranoid schizophrenia, methamphetamine dependence in sustained full remission, history of alcohol abuse, arthritis, chronic back pain, and hyperlipidemia, and assessed a GAF score of 55 to 60. (Tr. 507-08.)

On March 15, 2010, plaintiff reported improved condition and that he continued to hear voices but that they did not bother him. He stated that the voices occasionally had a face and that they spoke to him directly in different shapes but refused an increased dosage of Seroquel. Dr. Vasireddy described plaintiff's report as slightly dramatic. Plaintiff also reported increased restlessness. Dr. Vasireddy noted good mood and limited insight and judgment. He diagnosed chronic paranoid schizophrenia, methamphetamine dependence in sustained full remission, history of alcohol abuse, arthritis, chronic back pain, and hyperlipidemia and assessed a GAF of 60 to 65. (Tr. 505-06.)

On May 10, 2010, plaintiff reported that he continued to hear voices that occasionally instructed him to harm himself but that he did not follow them. He further reported that he continued to live with his parents and performed household chores and that he also applied for disability benefits. Dr. Vasireddy noted limited insight and judgment and discussed with plaintiff lifestyle changes, including smoking cessation, abstinence from drugs and alcohol, healthy diet, and exercise. He increased the Seroquel dosage and diagnosed chronic paranoid schizophrenia, methamphetamine dependence in sustained full remission, history of alcohol abuse, arthritis, chronic back pain, and hyperlipidemia. He assessed a GAF of 60 to 65. (Tr. 503-04.)

On July 12, 2010, Karen Salsman discharged plaintiff from psychiatric treatment at Comtrea. Plaintiff had requested the discharge, indicating that he would obtain psychiatric medications from Dr. Crawford. (Tr. 502.)

On August 13, 2010, plaintiff visited Dr. Crawford to manage schizophrenia and dyslipidemia. He assessed hypertension, dyslipidemia, and schizophrenia, and prescribed Lisinopril. (Tr. 476.)

On November 12, 2010, plaintiff complained of back pain. Chest X-rays showed no acute changes. Thoracic spine X-rays showed stable degenerative disc disease at T7-8, T8-9, and T9-10. Cervical spine X-rays showed no acute changes. Dr. Crawford increased plaintiff's

dosage of Seroquel and assessed hypertension, dyslipidemia, schizophrenia, gastroesophageal reflux disease, and back pain. (Tr. 456-58, 475.)

On February 21, 2011, Dr. Crawford described plaintiff's psyche as stable. He diagnosed hypertension, dyslipidemia, and gastroesophageal reflux disease. (Tr. 473.)

On April 17, 2011, plaintiff arrived at the Jefferson Regional Medical Center emergency room, complaining of chest pain that began four hours earlier. Plaintiff reported that the pain had resolved after arriving at the emergency room. Chest X-rays revealed no changes. Plaintiff also reported amphetamine use within the last two weeks. Rami M. Akel, M.D., diagnosed atypical chest pain. (Tr. 439-50.)

On April 21, 2011, plaintiff visited the Metro Heart Group of Saint Louis to follow up on chest pain. A stress echocardiogram indicated no ischemia, normal blood pressure response to exercise, and tolerance to exercise. Plaintiff did not complain of chest pain while exercising during the echocardiogram procedure. (Tr. 483.)

On May 18, 2011, plaintiff complained of hives all over his body starting to itch. He also complained of hearing voices. Dr. Crawford diagnosed arthritis, hypertension, schizophrenia, and gastroesophageal reflux disease. He continued the prescription for Seroquel and prescribed a drug to help with the itching. (Tr. 472.)

On May 31, 2011, plaintiff complained of having a cold since May 18. He stated that he still heard voices but that the itching and hives had improved. Dr. Crawford diagnosed hypertension, schizophrenia, and gastroesophageal reflux disease. (Tr. 470.)

On July 7, 2011, plaintiff complained of shoulder pain that began one week earlier. He reported that lifting the right arm caused the pain. Dr. Crawford noted poor range of motion. Shoulder X-rays revealed no fracture, dislocation, or bone or joint abnormality. (Tr. 469, 482.)

On August 1, 2011, plaintiff arrived at the emergency room, complaining of an itchy, blistery rash on his abdomen. Shayne S. Keddy, D.O., diagnosed shingles and prescribed Acyclovir and Vicodin.[10] (Tr. 420-24.)

---

[10] Acyclovir is a medication used to treat infections such as shingles, cold sores, and chickenpox. WebMD, http://www.webmd.com/drugs (last visited on June 24, 2014). Vicodin is a combination medication used to relieve moderate to severe pain. It contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen). Id. Hydrocodone works in the brain to change how your body feels and responds to pain. Id.

On August 3, 2011, plaintiff complained to Dr. Crawford of pain from shingles. He said the pain medications given to him in the emergency room had not helped and requested more pain medication. Dr. Crawford diagnosed shingles. (Tr. 467.)

On August 10, 2011, plaintiff continued to complain of pain from shingles. He requested an antibiotic for an abscessed tooth. Dr. Rowden diagnosed shingles and a dental abscess. (Tr. 466.)

On September 1, 2011, plaintiff requested pain medication for shingles. (Tr. 465.)

On September 30, 2011, plaintiff visited Dr. Crawford and continued to complain of pain from shingles. Dr. Crawford diagnosed shingles, hypertension, and schizophrenia. (Tr. 463.)

On October 28, 2011, plaintiff complained of shoulder pain caused by lifting his arm and shingles. Dr. Crawford suggested a shoulder MRI scan. (Tr. 462.)

On November 15, 2011, Thomas J. Spencer, Psy. D., performed a psychological evaluation on plaintiff. He based the evaluation on the interview with plaintiff. Plaintiff reported the following. He cannot work due to hearing voices, which began ten years earlier. He hears multiple voices that command him and are occasionally derogatory. He also suffers occasional paranoia and depression. He left Comtrea due to the turnover rate of its staff. Without Seroquel, he cannot sleep, and the voices are louder. He lives with his parents. He avoids eating due to the fear of poisoning. He also attempted suicide eight years ago. He last worked five years ago as a self-employed drywall taper. He has worked mainly in construction and drywall. He spends most of the day in the basement playing guitar and watching television. He has not habitually used illicit drugs, except for marijuana, and stopped drinking alcohol four or five years earlier.

Dr. Spencer noted that plaintiff denied hearing voices but observed him glance around the office twice. He did not observe paranoia or grandiosity but described his insight and judgment as questionable. He observed flat speech, average mood, and restricted affect. He also observed questionable dentition and an odor. Dr. Spencer diagnosed paranoid-type schizophrenia and alcohol dependence in sustained remission and assessed a GAF of 50 to 55. He concluded that plaintiff had a mental illness that interfered with his ability to engage in employment suitable for his age, training, experience, and education but that with continued sobriety and appropriate treatment and compliance, his prognosis would likely improve. (Tr. 494-97.)

**First ALJ Hearing**

The ALJ conducted a hearing on November 23, 2009. (Tr. 44-53.) Plaintiff testified to the following. He is forty-nine years old and has graduated from high school. He also applied for disability benefits in 2008, and was denied. He last used alcohol, cocaine, and speed one and a half years ago. He has never abused prescription drugs. (Tr. 46-47.)

He receives psychological care at Comtrea in Festus due to hearing voices all the time. The voices issue commands and encourage his death among other things. He sees Dr. Vasireddy and previously saw Dr. Rohatgi until he was transferred to another office. He has also seen three other physicians at Comtrea. Dr. Rohatgi never recommended that he switch from Seroquel. Instead, he lowered the dosage. He also never recommended that he should explore vocational rehabilitation. Comtrea never performed a blood or urine drug test. (Tr. 47-49.)

Lifting causes back soreness. He has no criminal background or felony convictions. He has no drug or alcohol offenses other than DUIs. The last DUI occurred around 1993 or 1991. (Tr. 49.)

He takes medication according to his prescriptions, except for the Benzopine. He has discussed his medications with his doctors and expressed his concerns with them. He merely requires assistance with quieting the voices to allow sleep. Seroquel is effective. While at Comtrea, he also saw a nurse practitioner, Roberta Stock for about one year. (Tr. 50.)

Vocational expert (VE) Brenda Young also testified at the hearing. The ALJ presented a hypothetical individual of plaintiff's age, education, and work experience. The hypothetical individual had no physical restrictions, can understand, remember and carry out at least simple instructions and undetailed tasks, can respond appropriately to supervisors and coworkers, can adapt to routine, simple work changes, can take appropriate precautions to avoid hazards, and should not work in a setting that includes constant or regular contact with the general public. The VE responded that such individual could perform as a material mover or warehouse worker, which is heavy, unskilled work with approximately 21,000 positions in the St. Louis metropolitan area and 840,000 positions nationally; a hand packer or packager, which is medium, unskilled work with about 9,000 positions in the St. Louis metropolitan area and 360,000 positions nationally. (Tr. 51-52.)

The ALJ presented a second hypothetical individual with plaintiff's impairments consistent with the October 2009 opinion of Dr. Rohatgi. The VE replied that such individual

could not maintain work due to the effect of the impairments on reliability and response to supervision and instruction. (Tr. 52.)

**First Decision of the ALJ**

On December 22, 2009, the ALJ found plaintiff not disabled and capable of performing jobs existing in significant numbers in the national economy. (Tr. 72-79.) However, on October 27, 2011, the Appeals Council remanded the case to the ALJ because the record did not contain an adequate evaluation of the opinions of nurse Stock or Dr. Rohatgi and the ALJ failed to consult Dr. Vasireddy, plaintiff's treating psychiatrist at the time. The Appeals Council ordered that the ALJ obtain the updated treatment records regarding schizophrenia and a medical source statement from Dr. Vasireddy, further consider the residual functional capacity determination and provide appropriate rationale, and obtain supplemental evidence from a VE if warranted by the expanded record. (Tr. 84-85.)

**Second ALJ Hearing**

On January 4, 2012 the ALJ conducted a second hearing. (Tr. 27-43.) Plaintiff testified to the following. He performed no work during the last three years, except for taping drywall for his brother for one hundred dollars, which took two hours. He cannot work due to voices, which issue commands and cause frustration. He hears them constantly and daily. For treatment, he sees Dr. Crawford and Dr. Cummings and takes Seroquel. He usually sees Dr. Crawford every three months and has also received treatment from Dr. Crawford for shingles and hives. (Tr. 30-31.)

The voices cause difficulty with concentrating and also cause his pain. He has experienced pain in his right arm for three months and has scars from shingles. He took anti-inflammatory pills for his arm but has since discontinued them. (Tr. 31-32.)

He disliked the side effects of the medications prescribed by the psychiatrists at Comtrea. Five years ago, he says Benzopine caused the inability to move his legs. He hears no voices when taking Seroquel, which induces sleep. He takes Seroquel only at night as prescribed but continues hears voices during the day. The voices would interfere with his ability to work because they aggravate him and the people around him. The voices are nice to other people but pressure him and issue commands. (Tr. 32-33.)

On a typical day, he gets up at 11:00 a.m. or noon. He then rakes leaves, cuts the grass, and occasionally washes dishes and cooks. He lives with his mother and father in their house. He has the basement to himself where he spends most of his time watching television. He plays the guitar, but the voices anger him by instructing him on when to change chords. He has friends, Barb and Frank, whom he occasionally sees. (Tr. 33-35.)

He does not drink alcohol. He has not used any street drugs since the beginning of 2011. Emergency records from April 2011 documented amphetamine use. He had amphetamines at the house but did not take them or use them regularly. He had not used street drugs for three to five years prior to 2011. He had serious problems with drugs and alcohol six or seven years ago. He was last charged with a DWI in 1993 or 1994. He used amphetamines in April 2011 and a few times since then but only when convenient and in small doses. (Tr. 35-37.)

He left Comtrea due to the high turnover rate of physicians, and he had seen five different physicians during his time there. He informs his physicians of his methamphetamine use. His current prescribed dosage of Seroquel is the same as when he was at Comtrea. He suffers the side effects caused by the other drugs prescribed by the psychiatrists at Comtrea; he stopped taking Benzopine because it caused "nausea legs." He has taken meth and speed without knowing their formulation or origin. (Tr. 38-39.)

Vocational Expert (VE) John McGowan also testified at the hearing. The ALJ presented a hypothetical individual with no relevant work history and plaintiff's age and education. The hypothetical individual could perform a full range of light work, understand and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers, adapt to routine and simple work changes, take appropriate precautions to avoid hazards, should not work in a setting that includes constant or regular contact with the general public or more than infrequent handling of customer complaints, and should not work in close proximity to alcohol or controlled substances. The VE responded that such individual could perform light cleaning housekeeping, which is light, unskilled work with 1,175 positions in Missouri and 917,120 positions nationally and light hand packaging, which is light, unskilled work with 4,200 positions in Missouri and 321,000 positions nationally. (Tr. 40-41.)

Plaintiff's counsel also presented a hypothetical individual with plaintiff's age, education, and work experience, who is subject to the limitations set forth in the opinion of nurse Stock, dated July 20, 2009. The VE responded that such individual could not sustain employment.

Plaintiff's counsel presented another hypothetical individual with the limitations set forth in Dr. Rohatgi, dated October 12, 2009, administered by Dr. Rohatgi. The VE responded that such individual also could not sustain employment. (Tr. 41-42.)

### III. DECISION OF THE ALJ

On March 26, 2012, the ALJ found the plaintiff not disabled. (Tr. 8-26.) At Step One of the prescribed regulatory decision-making scheme,[11] the ALJ found that the plaintiff had not engaged in substantial gainful activity since the application date, December 29, 2008. At Step Two, the ALJ found that the plaintiff's severe impairments were degenerative disc disease and degenerative joint disease of the cervical and thoracic spine, schizophrenia, and history of polysubstance abuse in questionable remission. (Tr. 12-13.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 14.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform a range of light work, understand, remember, and perform at least simple instructions and undetailed tasks, adapt to routine work changes, take appropriate precautions to avoid hazards, but should not perform work that includes more than infrequent handling of customer complaints or regular contact with the general public or work in close proximity to alcohol or controlled substances. At Step Four, the ALJ found that the plaintiff has no past relevant work. (Tr. 15-20.)

At Step Five, the ALJ considered plaintiff's age, education, work experience, and residual functional capacity and found that plaintiff could perform jobs that exist in significant numbers in the national economy. (Tr. 21.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a

---

[11] See below for explanation.

reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. §§ 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by (1) improperly evaluating the opinions of Nurse Stock, (2) improperly evaluating the opinions of Dr. Rohatgi, and (3) failing to support the RFC determination with substantial evidence.

**A. Opinion of Clinical Nurse Specialist Stock**

The ALJ's decision against plaintiff afforded little weight to Clinical Nurse Specialist Stock as her mental evaluations were inconsistent with her medical source statement. Plaintiff argues that the ALJ erred in his evaluation of the opinion of Nurse Roberta Stock. "[A] treating physician is normally entitled to great weight." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. While Stock is not a physician, she is a certified specialist in the field of adult mental health, and was in charge of plaintiff's treatment for over a year. The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c)(1).

The ALJ noted that throughout their visits together over the course of more than a year, Stock consistently questioned plaintiff's compliance with medication. (Tr. 260, 258, 254, 250, 397.) The ALJ noted Stock's mental medical source statement, dated May 6, 2009, which gave "marked" limitations in ten out of the fourteen categories, but did not mention plaintiff's non-compliance with medication. (Tr. 18.) The ALJ stated that the record reflected that plaintiff's symptoms were generally controlled with medication, and that, therefore, non-compliance would have a great impact on the assessment of his residual functional capacity. (Id.) However, "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'" Pate-Fires, 564 F.3d at 945.

Throughout her time conducting mental examinations on plaintiff, Stock noted his refusal to try another medication. (Tr. 260, 258, 255, 251, 248, 400.) She questioned his alleged abstinence from drugs and alcohol. (Tr. 259, 257, 255, 248.) Stock also commented on his mental status repeatedly describing him as dramatic and manipulative during their conversations.

(Tr. 250, 248, 399, 397.)  She commented that plaintiff was alert and oriented in their meetings, and always appeared neatly dressed and groomed.  (Tr. 259, 257, 255, 253, 250, 248, 399, 397.)  Plaintiff was never noted as being late to his appointments with Stock.  Finally, she noted that he was vague about what the voices in his head were telling him.  (Tr. 259, 257, 253, 248, 399, 397.)

The ALJ gave little weight to Nurse Stock's opinion, stating that her assessed GAF scores of between 50 and 55 in her evaluations throughout the previous year were inconsistent with the large number of "marked" limitations in the mental medical source statement from May 6, 2009.  (Tr. 18.).  He went on to say that, while he considered her reports and opinions, that as a "social worker" she is not an acceptable medical source.  (Tr. 18.)  While Roberta Stock is actually a Clinical Nurse Specialist in the field of adult mental health and not a social worker, the ALJ considered her opinions just the same, and found inconsistencies between the medical source statement's number of "marked" limitations and the record evidence indicating consistently alert and oriented mental exams.  The ALJ did not err in his treatment of Roberta Stock's opinion, granting it little weight.

## B. Opinion of Dr. Gautam Rohatgi

The ALJ's decision against plaintiff afforded little weight to Dr. Gautam Rohatgi's opinions as his medical source statement was inconsistent with the rest of the record, and Dr. Rohatgi had only met with plaintiff twice before completing his medical source statement.  Plaintiff argues that the ALJ improperly considered the opinion of Dr. Rohatgi.  "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."  Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009).  In his mental medical source statement, Dr. Rohatgi indicated "marked" impairments in plaintiff's ability to cope with normal work stress, and accept instructions and respond to criticism.  (Tr. 414-18.)  The ALJ found that the findings of moderate levels of limitation in all categories except for the two checked off as "marked" was more consistent with the findings in the rest of the record, while the "marked" limitations were inconsistent with the medical evidence in the record.  (Tr. 19.)  In his clinical treatment notes Dr. Rohatgi questioned plaintiff's compliance taking his medications as prescribed.  (Tr. 394, 390.)  He also noted that the plaintiff stated no symptoms of depression, hypomania, mania, or anxiety.  (Tr. 390, 392, 513.)  In each of their

visits Dr. Rohatgi stated that plaintiff heard voices that tell him what to do, but that he is able not to follow them.  (Tr. 390, 392, 513.)

Additionally, at the time of Dr. Rohatgi's mental medical source statement, he had visited with plaintiff as a patient only twice.  Having seen the plaintiff only twice before filling out the medical source statement, Dr. Rohatgi's opinion is not entitled to controlling weight.  See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) ("Vega's March letter . . . is not entitled to controlling weight as a medical opinion of a treating source. When she filled out the checklist, Vega had only met with Randolph on three prior occasions.")

The ALJ afforded the opinion of Dr. Rohatgi little weight for lawful reasons that find support in the record.  Accordingly, plaintiff's argument regarding the improper evaluation of Dr. Rohatgi's opinion by the ALJ is without merit.

## C. Record as a Whole

The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform work in conjunction with the Medical-Vocational Guidelines, and that, therefore, plaintiff is not disabled.  Plaintiff argues that the ALJ failed to support the RFC determination with substantial evidence from the record.  In answer to the plaintiff's mental impairments, the ALJ found that the medical records consistently show that he has generally normal mental status exams.  (Tr. 20.)  The ALJ found that the plaintiff consistently complained of mental impairments, including hearing voices, yet he has not required any period of hospitalization or emergency room treatment during the period at issue for those mental impairments.  (Tr. 247, 248, 250, 252, 253, 255, 257, 259, 301, 393, 395, 397, 399, 516.)  Again and again he declined the recommended help and treatments of his doctors.  For example, plaintiff declined to go to treatment programs (Tr. 399); he asked his doctor to show that he was taking a higher dosage of medication than he actually takes  (Tr. 390); and he consistently refused to change to another medication.  (Tr. 248, 251, 254, 255, 258, 260, 400, 505.)  Plaintiff also testified in 2012 that taking his medication took the voices completely away, and plaintiff was assessed GAF scores as high as 75.  (Tr. 32-33, 318.)  Beyond the noncompliance with his prescribed drugs, plaintiff has a history of methamphetamine abuse, including use as recently as April 2011 when he visited the emergency room for chest pain.  (Tr. 439-50.)  He was also untruthful in a 2012 psychological evaluation performed by licensed psychologist Dr. Thomas Spencer about his history with illicit drugs.  (Tr.

494-97.)  Overall, in regards to the plaintiff's mental impairments, the ALJ found the plaintiff simply not credible.  (Tr. 20)

Furthermore, Plaintiff told his doctor in 2010 that he performs household chores, and testified in 2012 that in a typical day he rakes leaves, cuts grass, and occasionally washes dishes and cooks.  (Tr. 503-504, 33-35.)  The ALJ determined based on the record as a whole that, with medication, the plaintiff can understand, remember, and carry out at least simple instructions and non-detailed tasks; respond appropriately to supervisors and co-workers; adapt to routine/simple work changes; take appropriate precautions to avoid hazards; and should not work in a setting which includes more than infrequent handling of customer complaints.  (Tr. 20.)

For the above mentioned reasons, the ALJ did not err in his consideration of the record as a whole, or of the opinions of nurse Stock and Dr. Rohatgi.  Accordingly, plaintiff's argument regarding the RFC determination is without merit.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


_____/S/  David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on July 30, 2014.